FILED
LODGED ENTERED
RECEIVED

OCT 29 2001

CLERK U.S. DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE
DEPUTY

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

VICTOR MENOTTI; THOMAS SELLMAN;
TODD STEDL; ANDREW RUSSELL;
LAUREN HOLLOWAY; RONALD MATYJAS
and DOUG SKOVE,

    Plaintiffs,

v.

CITY OF SEATTLE; PAUL SCHELL,
Mayor of Seattle; NORMAN
STAMPER, Chief of Police,
Seattle Police Department;
MICHAEL B. JENNINGS, a Seattle
Police officer; and S.D.
STEVENS, a Seattle Police
officer,

    Defendants.

NO. C00-372R

ORDER GRANTING IN PART AND
DENYING IN PART DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT
AND DENYING PLAINTIFFS'
CROSS-MOTION FOR SUMMARY
JUDGMENT

ORDER
Page - 1 -

AO 72
(Rev. 8/82)



| | |
|---|---|
| ROBERT HICKEY; KENNETH HANKIN; JENNIFER HUDZIEC; and STEPHANIE LANE, on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>   v.<br><br>THE CITY OF SEATTLE, a municipality; PAUL SCHELL, Mayor of the City of Seattle; NORMAN STAMPER, Former Chief of Police of the City of Seattle,<br><br>          Defendants. | NO. C00-1672R |
| CAPTAIN JESSE PETRICH,<br><br>          Plaintiff,<br><br>   v.<br><br>CITY OF SEATTLE and SEATTLE POLICE DEPARTMENT; JOHN DOE OFFICER,<br><br>          Defendants. | NO. C00-855R |

ORDER
Page - 2 -

AO 72
(Rev. 8/82)

| | |
|---|---|
| COLIN CALLAHAN BRYNN; and BRYAN NEUBERG,<br><br>                    Plaintiffs,<br><br>     v.<br><br>CITY OF SEATTLE, a municipal corporation; PAUL SCHELL, in his capacity as Mayor of the City of Seattle and as an individual; NORMAN STAMPER, in his capacity as Chief of Police of the City of Seattle and as an individual; EDWARD JOINER, in his capacity as Assistant Chief of the City of Seattle and as an individual,<br><br>                    Defendants. | NO. C00-2123Z |
| LIFE HAS MEANING a/k/a MARY ELIZABETH WILLIAMS; ESTELLA WALLACE; DAWN MONTOYA; PATRICIA WATSON; WILLIAM WATKINS; ANDREW BERNHARDT; KEN OLSON and TAMRA R. FOGGY,<br><br>                    Plaintiffs,<br><br>     v.<br><br>CITY OF SEATTLE; PAUL SCHELL; NORM STAMPER; JOHN DOE #1; JOHN DOE #2; JOHN DOE #3; JOHN DOE #4; JOHN DOE #5; JOHN DOE #6; JOHN DOE #7; JOHN DOE #8; JOHN DOE #9; JOHN DOE #10; JOHN DOE #11; JOHN DOE #12; JOHN DOE #13; JOHN DOE #14; JOHN DOE #15; and JOHN DOE #16,<br><br>                    Defendants. | NO. C00-1998C |

ORDER
Page - 3 -

MICHAEL CROWLEY,

        Plaintiff,

v.

THE CITY OF SEATTLE, a municipal corporation; and JOHN DOE #1 and JOHN DOE #2, in their capacity as police officers or recruits for the City of Seattle and as individuals whose true names are unknown,

        Defendants.

NO. C01-336R

THIS MATTER comes before the court on the motion of defendants for summary judgment, and on the cross-motion of plaintiffs for summary judgment. These cases have been consolidated for the purpose of resolving legal issues common to all parties. Having reviewed the papers filed in support of and in opposition to these motions, the court finds that oral argument would not prove useful and rules as follows:

## I. BACKGROUND

These consolidated actions arise out of events occurring during the World Trade Organization ("WTO") conference in Seattle from November 30, 1999 to December 4, 1999. Representatives from the 134 member nations gathered to discuss world trade issues, and the President of the United States appeared as well. During the conference, thousands of people also descended on Seattle, many of

ORDER
Page - 4 -

them intending to protest the policies and presence of the WTO. The bulk of people converged on a multi-block area of Seattle's downtown core near the convention center. Several groups planned organized marches, while other people chose to protest individually, and still others planned civil disobedience.

Another group of protesters had more violent intentions. The day before the conference officially started, protests and vandalism began occurring downtown. People spraypainted buildings and broke windows. A crowd gathered around Niketown and pounded windows and nearby cars.

On November 30, the conference officially opened, and the number of people in downtown Seattle near the WTO conference swelled to the tens of thousands. Protesters occupied intersections and blocked access – sometimes by chaining themselves to manhole covers. People overturned dumpsters and set fires; approximately 100 people jumped on cars; others threw sticks, metal spikes, and concrete at the police. Some demonstrators pushed and shoved WTO delegates in an attempt to shut down the conference. Others blocked emergency and law enforcement vehicles.

The magnitude of the protests and the violence overwhelmed law enforcement resources. The city had to divert resources from the protest clashes to the WTO conference so law enforcement could protect the international delegates. By mid-morning, defendants ordered all delegates to remain in their hotels until order was

ORDER
Page - 5 -

restored. Later in the day, demonstrators slashed tires and looted local businesses. They lit dumpsters on fire and pushed them into police lines.

On the afternoon of November 30, the city responded to the chaos by declaring a civil emergency. Mayor Paul Schell ("Schell") also imposed a curfew in downtown Seattle. Unfortunately, the violence, property destruction, fires, and arrests continued throughout the afternoon and the night. Protesters pelted officers with sticks, bottles, and debris. One group set a large fire at a main intersection. Another group wreaked havoc on Niketown, this time forcing police to evacuate employees. A different crowd pulled a garbage truck driver from his vehicle, forcing a police rescue. Riots continued through the early hours of the morning.

During the riots, President Clinton arrived in Seattle. Faced with the prospect of protecting the President, and the need to continue the international conference, Schell signed Emergency Order Number 3 ("Order") in the early morning hours of December 1. The Order established a restricted zone ("zone") in the downtown area. The zone encompassed the convention center where the WTO conference was taking place, nearby hotels where delegates and the President were staying, and a portion of downtown Seattle. The Order affected about 25 city blocks.

The text of the Order limited those who could access the zone

ORDER
Page - 6 -

to (1) delegates and authorized WTO personnel, (2) owners and employers of businesses and other personnel necessary to operate those businesses, (3) residents, and (4) emergency and safety personnel. A later order added city officials and credentialed representatives of the press. The defendants imposed the zone to quell the continuing violence and to provide a secure area for the President, world leaders, and citizens. Demonstrators could continue protesting outside the boundaries of the zone, but safety concerns precluded their entry into the WTO conference area. Schell encouraged businesses within the zone to remain open so the city could return to its normal functions. Despite the Order and the civil emergency, hundreds of demonstrators attempted to enter the zone and were arrested and clashes with police continued.

The WTO conference concluded its meetings on Friday, December 3. On December 4, Schell terminated the civil emergency, including the curfew and restricted zone. The plaintiffs later filed various complaints that challenged the restricted zone under the First Amendment and Fourteenth Amendment. Other plaintiffs challenged their arrests under the Fourth Amendment and state law. The Court consolidated these causes of action to decide legal issues.

## II. ANALYSIS

Defendants have moved for summary judgment on the following issues: (1) whether the emergency provisions of the Seattle

ORDER
Page - 7 -

Municipal Code, Chapter 10.02, are constitutional on their face, (2) whether Mayor Schell acted within his authority under the code when declaring a state of emergency, establishing a curfew, and creating a restricted zone, (3) whether Mayor Schell's Order Number 3, which created the curfew and restricted zone, was constitutional on its face,[1] (4) whether probable cause existed to arrest individuals who violated the curfew or restricted zone, (5) whether probable cause existed to arrest individuals who obstructed vehicular or pedestrian traffic and failed to disperse, and (6) whether a city policy existed that led to a failure to train or supervise law enforcement officers.  Plaintiffs cross-moved for summary judgment on (1) whether Order No. 3 was constitutional on its face and (2) whether the Order was constitutional as applied through the creation of the restricted zone.

Some of the rulings sought by defendants are on issues undisputed in these cases.  Plaintiffs have not challenged the constitutionality of the Seattle Municipal Code, and they have not challenged Schell's authority under the code.  Plaintiffs also have not challenged the curfew or the state of emergency.  Because plaintiffs have not challenged these actions (nor do they intend to challenge them), it is unnecessary for the Court to rule on

---

[1] Defendants' motion initially sought a ruling on the Order as applied, but defendants have since narrowed their motion to the Order's facial constitutionality.

ORDER
Page - 8 -

their constitutionality. Defendants' motion on those points will be STRICKEN.

## A. Defendants' Motion for Summary Judgment on the Facial Constitutionality of Order Number 3

Laws that limit speech based on content must meet an exacting strict scrutiny standard. See, e.g., Metromedia, Inc. v. San Diego, 453 U.S. 490, 513-14 (1981). This is because the government "may not choose the appropriate subject for public discourse." Id. at 514. Moreover, the government cannot bar expression of a particular viewpoint on a subject. See R.A.V. v. City of St. Paul, 505 U.S. 377 (1992). An ordinance is content-based on its face if the language or the manifest purpose targets speech.[2] See, e.g., Turner Broad. Sys. v. FCC, 512 U.S. 622, 642-43 (1994); Police Dep't of the City of Chi. v. Mosley, 408 U.S. 92, 96 (1972). A law that does not target expression on its face is not content based even if it incidentally affects one group of

---

[2] Parties also may challenge a statute on its face for "overbreadth." Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973). Overbreadth challenges acknowledge that a law is constitutional in the plaintiff's situation but nonetheless argue that the provision illegally limits the First Amendment rights of third parties. See, e.g., Brockett v. Spokane Arcades, Inc., 472 U.S. 491, 498 (1985). If the parties to the lawsuit argue that the provision is unconstitutional as applied to them, it is unnecessary for the court to reach an overbreadth challenge. Members of City Council v. Taxpayers for Vincent, 466 U.S. 789, 802 (1984). The parties here challenge the Order on its face and as applied through creation of the restricted zone, so they do not rely on the rights of third parties not before the Court. Therefore, the Court need not address facial overbreadth.

ORDER
Page - 9 -

speakers more than another group when applied neutrally. See <u>Ward v. Rock Against Racism</u>, 491 U.S. 781, 791 (1989); see also <u>Hill v. Colorado</u>, 500 U.S. 703, 719-20 (2000) (law must apply equally to all).

The Order, as written, is content-neutral and therefore does not violate the First or Fourteenth Amendment. Order Number 3 establishes a restricted zone in the downtown core of Seattle, and the language does not address expression. Dkt # 47, Exh. 10. It establishes the zone to protect WTO delegates, to prevent violence, and to protect those who work and live downtown. <u>Id.</u>, Exh. 2, Schell Dep., at 38. Orders are not content-based if they limit entrance to a dangerous area to those necessary for the area to function. See <u>United States v. Griefen</u>, 200 F.3d 1256, 1263 (9th Cir. 2000) (access limited in construction zone). Although officials ultimately excluded protesters, docket # 47, Exh. 4, Joiner Dep., at 39-42, there is no evidence that the "manifest purpose" of the city was to quell expression. The defendants' motion for summary judgment on the facial constitutionality of the Order will be GRANTED and plaintiffs' cross-motion will be DENIED.

B. <u>Plaintiffs' Motion for Summary Judgment on the Constitutionality of the Order as Applied Through the Restricted Zone</u>

A law that on its face is content-neutral may still violate

ORDER
Page - 10 -

the First Amendment when implemented by authorities.³  See Taxpayers for Vincent, 466 U.S. at 803 n.22.  Although the government can regulate the time, place, and manner of expression, a restriction is valid only if it (1) is content neutral, (2) serves a significant government purpose, (3) is narrowly tailored and (4) allows for ample alternatives for expression.  See Ward, 491 U.S. at 791.

### 1. Content Neutral

As described above, the Order is facially content-neutral, but the plaintiffs argue that the defendants applied it to improperly exclude speech based on content and viewpoint.  They claim the defendants favored commercial speech over political speech when they allowed shoppers to enter the zone.  However, as defendants explained, allowing shoppers to enter was an attempt to enable the city to continue functioning as much as possible in the midst of a chaotic situation.  Allowing normal operations to continue is not the same as favoring commercial speech.  Cf. Metromedia, 453 U.S. at 513 (example of favoring commercial speech when city allowed commercial billboards but not non-commercial billboards).  Nor did the defendants discriminate on viewpoint by

---

³Plaintiffs' motion challenges the Order and the broader restricted zone "as applied."  However, plaintiffs do not challenge the Order or zone as applied to specific individuals.  The motion, therefore, is not a classic example of an "as applied" challenge. It is perhaps more easily understood as a challenge to the Order as implemented in the creation of the restricted zone.

ORDER
Page - 11 -

permitting WTO delegates into the zone. Again, the defendants simply allowed the conference to continue as planned and protected the safety of WTO delegates. The Order was applied in a content-neutral manner.

2. Significant Government Interest

Any content-neutral restriction on speech must serve a significant government interest. The circumstances in which a law is applied guide the Court's analysis. See Smith v. Avino, 91 F.3d 105, 108 (11th Cir. 1996) (government has discretion to act quickly in emergency). "An inherent tension exists between the exercise of First Amendment rights and the government's need to maintain order during a period of social strife." In re Juan C., 33 Cal. Rptr. 2d 919, 922 (Cal. Ct. App. 1995). While the First Amendment preserves the free exchange of competing ideas in public forums, at the same time, "[t]he invocation of emergency powers necessarily restricts activities that would normally be constitutionally protected." United States v. Chalk, 441 F.2d 1277, 1280 (4th Cir. 1971).

The government requires broad discretion in responding to an emergency situation. See, e.g., id. at 1280; see also Smith, 91 F.3d at 109. Because "control of civil disorders that may threaten the very existence of the State is certainly within the police power of government," free speech must sometimes bend to public safety. Chalk, 441 F.2d at 1279, quoting Stotland v. Penn-

ORDER
Page - 12 -

sylvania, 398 U.S. 916, 920 (1970). The government's actions during a state of emergency are valid if reasonably necessary to preserve order. See Smith, 91 F.3d at 109; Chalk, 441 F.2d at 1281. The traditional test is whether defendants acted in good faith and with some reason for their actions. See Chalk, 441 F.2d at 1281; Cougar Business Owners Ass'n v. State, 97 Wn.2d 466, 647 P.2d 481 (1982).

The Court finds that the defendants properly applied their emergency powers by implementing the restricted zone. Safety is recognized as a significant government interest, as are the First Amendment rights of WTO delegates. See generally Griefen, 200 F.3d 1256; see also Perry v. Los Angeles Police Dep't, 121 F.3d 1365, 1369 (9th Cir. 1997). Plaintiffs have not challenged the existence of an emergency. Nor is there any evidence that the defendants acted in bad faith when implementing the Order. The evidence is only that Schell and the other defendants hoped to protect the WTO delegates, the President, and the public.

Finally, the evidence shows that the defendants had reason to implement the zone. The police had faced violent clashes with protesters for nearly 24 hours, and there is no evidence that the violence was expected to subside. Moreover, the President had just arrived in Seattle and intended to appear at the WTO conference. WTO delegates had faced assaults the prior day and were required to travel again from their hotels to the conference

ORDER
Page - 13 -

center on the coming days. Chaos and vandalism continued unabated.

The Ninth Circuit in Griefen upheld a similar restricted zone in a *non-emergency* situation. 200 F.3d at 1256. The government blocked all people – including protesters – from a construction site for safety reasons. Id. at 1262. The only persons allowed into the site were those necessary for it to function. Id. Protesters and the public were required to remain outside the construction boundaries. Id. Just as in Griefen, the Seattle zone allowed in only those necessary for the city to carry on its normal functions: WTO delegates, business owners and customers, and employees and other limited groups. Everyone else, protester or not, remained outside.

Griefen's reasoning is even more pertinent during an emergency. The panel touched on the broad powers required during emergencies, saying "we have no doubt" that the government can temporarily close "a street engulfed in a riot or an unlawful assembly." Id. at 1263. In addition, "vandalism can hardly be characterized as activity protected by the First Amendment." Id. at 1262. The defendants in the current case faced ongoing vandalism, riots, and violence that justified creation of the zone.

The plaintiffs argue that the emergency powers cases do not apply, and that Collins v. Jordan controls. 110 F.3d 1363 (9th Cir. 1997). In deciding whether the defendants could claim quali-

ORDER
Page – 14 –

fied immunity in a lawsuit, the Collins court held that it was unreasonable for the defendants to believe that during a state of emergency San Francisco could ban *all* protests throughout the entire city. Id. at 1371. The court reached this decision although violent outbreaks had occurred during demonstrations the prior night, and authorities feared additional violence. Id. at 1372. "The law is clear that First Amendment activity may not be banned simply because prior similar activity led to or involved instances of violence." Id.

Collins differs greatly from the current case. Unlike Collins, the violence and riots were continuing unabated in Seattle at the time the defendants issued the Order and implemented the zone. The defendants did not base their decisions solely on past events; rather, they reacted to the chaos that continued to occur even after the imposition of a curfew and in light of the presence of the President and foreign dignitaries. Nor did the defendants ban all protests throughout the city as did the defendants in Collins. Instead, the defendants created a circumscribed zone surrounding the WTO conference and allowed demonstrations anywhere else downtown and in the city at large. While the Court recognizes that "[t]he generally accepted way of dealing with unlawful conduct that may be intertwined with First Amendment activity is to punish it after it occurs," Id. at 1371-72, the amount of violence and number of protesters in the Seattle downtown core

ORDER
Page - 15 -

precluded such a course of action. The defendants acted properly within the scope of their emergency powers when implementing the zone, and the establishment of the zone clearly served a legitimate government purpose.

### 3. Narrowly Tailored

In addition, the Court finds that the emergency order was narrowly tailored so as to constitute a valid time, place, and manner regulation. The government need not create a tight fit between the policy goals and the policy it implements, although it must not use measures broader than necessary. See, e.g., Madsen v. Women's Health Ctr., 512 U.S. 753, 771-72 (1994) (small buffer zone narrowly tailored, larger zone not narrowly tailored); Bay Area Peace Navy v. United States, 914 F.2d 1224, 1228 (9th Cir. 1990). Defendants did not restrict more speech than necessary in Seattle. The Order, as implemented, affected only a section of downtown and not the entire city. Compare Madsen, 512 U.S. at 771 (small protected zone was narrowly tailored), with Collins, 110 F.3d at 1372 (citywide ban on protests too broad). The zone covered only enough territory for the WTO delegates and the President to move safely from their hotels to the convention and lasted only during the conference.

### 4. Ample Alternatives

Finally, the zone allowed ample alternatives for expression. While an alternative that does not allow speakers to reach their

ORDER
Page - 16 -

intended audience does not suffice, See United States v. Baugh, 187 F.3d 1037, 1044 (9th Cir. 1999); Bay Area, 914 F.2d at 1229, the demonstrators in Seattle could reach their audiences. They could protest just outside the boundaries of the zone and anywhere else in the city. Moreover, they had access to the media and to the public beyond the zone. The measure as implemented was a valid time, place, and manner regulation.[4] The plaintiffs' cross-motion for summary judgment is DENIED.

C. Defendants' Motion for Summary Judgment on Probable Cause to Arrest

Summary judgment is appropriate only if there is no genuine issue of material fact. Fed. R. Civ. P. 56. The defendants request a ruling that law enforcement officers had probable cause to arrest those who violated the Order and who obstructed vehicle or pedestrian traffic after failing to disperse. To the extent defendants seek a ruling that there is probable cause to arrest persons who law enforcement officers believe are breaking the law, this is simply a reiteration of the principle of probable cause

---

[4] Plaintiffs also seem to argue that the zone acted as a prior restraint. A prior restraint exists when a government agent prohibits speech before it occurs based on content. See Alexander v. United States, 509 U.S. 544, 550 (1993). As explained, neither the Order's language nor its implementation in the form of the restricted zone discriminated on content or viewpoint, so the measure did not act as a prior restraint. Plaintiffs also claim, without explanation, that their right to freedom of assembly was violated. The Order and zone allowed assemblies to continue and merely regulated the location of the assemblies in light of the emergency. No violation occurred.

ORDER
Page - 17 -

rather than an issue appropriate for summary judgment.

To the extent defendants seek an application of the probable cause principle to individual cases, plaintiffs have raised factual disputes that preclude summary judgment. They have provided evidence that dispersal warnings may not have been clear, that statutory exceptions may have applied to demonstrators' behavior, and that intent is a key element in the alleged crimes. As probable cause is a fact-intensive inquiry that could turn on these disputed elements, the decision is more appropriate for the trier of fact. See McKenzie v. Lamb, 738 F.2d 1005, 1008 (9th Cir. 1978). The defendants' motion for summary judgment will be DENIED.

D.  Defendants' Motion for Summary Judgment on Failure to Train or Supervise

A municipality may be liable under 42 U.S.C. § 1983 for failure to train or supervise only if its failure reflects a "deliberate indifference." See Bryan County Comm'rs v. Brown, 520 U.S. 397, 409-10 (1997); City of Canton, Ohio v. Harris, 489 U.S. 378, 388-89 (1989). Plaintiffs have provided no evidence that defendants had a policy of failing to train or supervise or that defendants acted with deliberate indifference. At best, plaintiffs provide evidence that some law enforcement officers may have used excessive force and may not have received adequate training. These facts do not rise to the level of deliberate indifference.

ORDER
Page - 18 -

Defendants' motion for summary judgment will be GRANTED.

### III. CONCLUSION

The court GRANTS in part and DENIES in part defendants' motion for summary judgment and DENIES plaintiffs' motion for summary judgment.

DATED at Seattle, Washington this 29th day of October, 2001.

*/s/ Barbara J. Rothstein*
BARBARA JACOBS ROTHSTEIN
UNITED STATES DISTRICT JUDGE

ORDER
Page - 19 -